Slip Op. 20–141

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CLEARON CORP. and OCCIDENTAL CHEMICAL CORP., | : |
| Plaintiffs, | : |
| v. | : Before: Richard K. Eaton, Judge |
| UNITED STATES, | : Consol. Court No. 17-00171 |
| Defendant, | : |
| and | : |
| HEZE HUAYI CHEMICAL CO., LTD., | : |
| Defendant-Intervenor. | : |

### OPINION and ORDER

[United States Department of Commerce's remand results are remanded.]

Dated: October 8, 2020

*James R. Cannon, Jr.*, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Plaintiffs. With him on the brief were *Jonathan M. Zielanski* and *Ulrika K. Swanson*.

*Sonia M. Orfield*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel on the brief was *Catherine Miller*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, DC, argued for Defendant-Intervenor. With him on the brief were *J. Kevin Horgan* and *Alexandra H. Salzman*.

Eaton, Judge: Before the court are the remand results of the United States Department of

Commerce ("Commerce" or the "Department"), pursuant to the court's order in *Clearon Corp. v.*

*United States*, 43 CIT __, 359 F. Supp. 3d 1344 (2019) ("*Clearon I*").[1] *See* Final Results of

Redetermination Pursuant to Court Order (May 16, 2019), P.R.R.[2] 5 ("Remand Results").

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2012) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).

In the final results under review in *Clearon I*, Commerce used adverse facts available,

pursuant to its authority under 19 U.S.C. § 1677e(a)-(b),[3] to determine a countervailing duty rate

for Consolidated Plaintiff and Defendant-Intervenor Heze Huayi Chemical Co., Ltd. ("Heze"),[4] a

mandatory respondent. The Department found that the use of adverse facts available was

warranted, even though Heze had been cooperative, because the Government of China ("China")

failed to provide information that Commerce requested about the operation of a governmental loan

program called the Export Buyer's Credit Program.[5] *See Chlorinated Isocyanurates From the*

---

[1]     This case involves the first administrative review of the countervailing duty order on chlorinated isocyanurates from the People's Republic of China. *See Chlorinated Isocyanurates From the People's Rep. of China*, 79 Fed. Reg. 67,424 (Dep't Commerce Nov. 13, 2014) (countervailing duty order); *Chlorinated Isocyanurates From the People's Rep. of China*, 82 Fed. Reg. 27,466 (Dep't Commerce June 15, 2017) (final results) and accompanying Issues and Dec. Mem. (June 9, 2017), P.R. 117. Chlorinated isocyanurates are "derivatives of cyanuric acid, described as chlorinated s-triazine triones" that are used for water treatment, among other uses. *See Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1346 n.2 (citation omitted).

[2]     References to the public record are designated as "P.R." and to the public remand record as "P.R.R."

[3]     The statute provides that, when necessary information is missing from the record, Commerce must use "facts otherwise available." 19 U.S.C. § 1677e(a). The statute also permits Commerce to use an adverse inference when selecting from among the facts available, if "an interested party or any other person," including a foreign government, fails to cooperate with Commerce's requests for information to "the best of its ability." 19 U.S.C. § 1677e(a), (b); *see Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371 (Fed. Cir. 2014).

[4]     Heze is the plaintiff in *Heze Huayi Chemical Co. v. United States*, Court No. 17-00185, which is consolidated under the lead case, Consolidated Court No. 17-00171.

[5]     As discussed *infra*, the Export Buyer's Credit Program "provides credit at preferential rates to foreign purchasers of goods exported by Chinese companies" through the state-owned China Export Import Bank. *Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1347.

*People's Rep. of China*, 82 Fed. Reg. 27,466 (Dep't Commerce June 15, 2017) ("Final Results")

and accompanying Issues and Dec. Mem. (June 9, 2017), P.R. 117 ("Final IDM"). Without this

information, Commerce found it could not fully understand the program, and therefore could not

verify Heze's declarations of non-use of the program; thus, Commerce found the declarations

unreliable. Using adverse facts available, Commerce then concluded that Heze had used and

benefitted from the program during the period of review. In other words, it used adverse facts

available to find that the statutory requirement, that a respondent receive a "benefit" from a

"financial contribution" (*e.g.*, a government loan), was satisfied. *See* 19 U.S.C. § 1677(5)(B)

(defining subsidy). Commerce found that Heze used and benefitted from the program,

notwithstanding uncontroverted declarations on the record stating that neither Heze nor its

customers had used or benefitted from the program during the period of review.

Thereafter, the Department selected an adverse facts available subsidy rate for the Export

Buyer's Credit Program by applying its hierarchical method for administrative reviews. The

Department selected a 0.87 percent rate, which had been determined for a governmental loan

program (the Export Seller's Credit Program) in a prior segment of the same proceeding. *See*

*Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1360-62; 19 U.S.C. § 1677e(d) (Supp. III 2015).

When calculating the net countervailing duty rate for Heze, Commerce included the *ad*

*valorem* subsidy rate of 0.87 percent as a part of its calculation (*i.e.*, as an adverse facts available

---

Commerce asked China to provide information regarding: (1) whether the China Export Import
Bank used third-party banks to disburse/settle export buyer's credits; (2) interest rates during the
period of review; (3) whether export buyer's credits were limited to business contracts exceeding
$ 2 million; and (4) suspected 2013 amendments to the bank's internal procedures for the Export
Buyer's Credit Program. *See id.*, 43 CIT at __, 359 F. Supp. 3d at 1355-56.

rate for the Export Buyer's Credit Program).[6] With the addition of subsidy rates for electricity

provided for less than adequate remuneration, and for self-reported grants, Heze received a net

countervailing duty rate of 1.91 percent,[7] which it appealed to this Court. *See* Final Results, 82

Fed. Reg. at 27,467; Final IDM at 7.

In *Clearon I*, the court held that Commerce's use of adverse facts available could not be

sustained because the agency had failed to explain, and support with record evidence, its finding

that the operational information that was missing from the record was "necessary"—a statutory

requirement that must be satisfied before Commerce may apply an adverse inference to the missing

information. *See* 19 U.S.C.§ 1677e(a)-(b). In particular, the court found, Commerce had failed to

"tie its facts available determination (and therefore its adverse facts available determination) to

Heze, its products, or its customers," and remanded the matter for further action. *See Clearon I*,

43 CIT at __, 359 F. Supp. 3d at 1360.

In the Remand Results, now before the court, Commerce again found that necessary

information was missing from the record. For Commerce, information about the operation of the

Export Buyer's Credit Program was necessary because without it, verification of Heze's claims

that neither it, nor its customers, used or benefitted from the program during the period of review

would be "unreasonably onerous, if not impossible." *See* Remand Results at 19. The "unreasonably

onerous" finding was made without an actual attempt to verify the claims of non-use.

---

[6]      Commerce calculates "an *ad valorem* subsidy rate by dividing the amount of the benefit allocated to the period of [review] . . . by the sales value during the same period of the product or products to which [it] attributes the subsidy . . . ." 19 C.F.R. § 351.525(a).

[7]      Although the parties do not dispute the Commerce's computation of Heze's final net subsidy rate of 1.91 percent *ad valorem*, it is not clear how the agency arrived at this figure, when it determined a 0.91 percent rate for electricity provided for less than adequate remuneration and a 0.55 percent rate for self-reported grants. *See* Final IDM at 7. Together with the 0.87 percent rate for the Export Buyer's Credit Program, the sum of these figures equals 2.33 percent.

For the reasons below, Commerce's explanation, that the missing operational information was necessary to permit verification of the evidence supporting Heze's claims of non-use, lacks the support of substantial evidence and is otherwise not in accordance with law. This matter is remanded again for Commerce to at least attempt to verify this evidence, which is pertinent to the statutory inquiry of whether a "benefit" was received by Heze. *See* 19 U.S.C. § 1677(5)(B). Based on the results of verification, Commerce must then determine whether "the manufacture, production, or export of" Heze's merchandise was unlawfully subsidized. *See* 19 U.S.C. § 1671(a)(1). The parties are directed to confer and agree upon a procedure that will allow Commerce to verify Heze's declarations of non-use. Alternatively, Commerce may find, based on the existing record evidence, that neither Heze nor its customers used or received a benefit under the program.

## BACKGROUND

### I.     Summary of Relevant Statutory Background

Under the countervailing duty statute, Commerce is tasked with determining whether "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a)(1). A subsidy is countervailable when (1) a foreign government provides a financial contribution, such as a loan, (2) to a specific industry, and (3) a recipient within the industry receives a benefit as a result of that contribution. *See id.* § 1677(5)(A), (B), (D). If Commerce determines that each of these elements is satisfied, then it must impose a duty equal to the amount of the net countervailable subsidy. *Id.* § 1671(a)(1).

Under the adverse facts available statute, if Commerce determines that "necessary information is not available on the record," or a party withholds information that has been requested by Commerce, Commerce must use "facts otherwise available" to fill in the gaps in the record. *See* 19 U.S.C. § 1677e(a). If Commerce determines that the use of facts otherwise available is warranted, and makes the additional finding that a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it may use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).

The aim of the adverse facts available statute is to encourage future compliance with Commerce's requests for information, not to punish. *See Bio-Lab, Inc. v. United States*, 44 CIT __, __, 435 F. Supp. 3d 1361, 1368 (2020) (citation omitted). In countervailing duty cases, where a foreign government is the primary possessor of information about, *e.g.*, governmental loan programs, courts have found permissible Commerce's use of adverse facts available even when it has an adverse impact on a cooperative respondent. *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371, 1373 (Fed. Cir. 2014). "The rationale for permitting the application of [adverse facts available] to cooperative respondents is that 'a remedy that collaterally reaches [a cooperative respondent] has the potential to encourage the [foreign government] to cooperate so as not to hurt its overall industry.'" *Bio-Lab*, 44 CIT at __, 435 F. Supp. 3d at 1368 (quoting *Fine Furniture*, 748 F.3d at 1373).

## II.    Factual Background

The factual background of this case is set out in detail in *Clearon I*, familiarity with which is presumed. The facts pertinent to the issues discussed in this opinion are summarized here.

The China Export Import Bank, a state-owned entity, administers the Export Buyer's Credit Program, through which it extends "mid- to long-term credit loans issued to foreign borrowers used for importers to make payments to Chinese exporters for goods, thereby promoting the export of Chinese goods and technical services." *Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1347.

Here, Commerce sought information about the program by issuing questionnaires to Heze and China. Commerce asked Heze, *inter alia*, whether the company or its customers used or benefitted from the program during the period of review. Heze answered that neither it nor its customers used or benefitted, directly or indirectly, from the program, and filed customer declarations certifying their non-use of the program. *See id.*, 43 CIT at __, 359 F. Supp. 3d at 1347. The company submitted a total of forty-four declarations of non-use by its U.S. and non-U.S. customers during the review. *Id.*, 43 CIT at __, 359 F. Supp. 3d at 1347. Its responses regarding non-use were confirmed by China. *See id.*, 43 CIT at __, 359 F. Supp. 3d at 1348 & n.5.

By questionnaires to China, Commerce sought information about the Export Buyer's Credit Program, including (1) whether the China Export Import Bank uses third-party banks to disburse/settle export buyer's credits; (2) the interest rates[8] the bank used during the period of review; (3) whether the bank limits the provision of export buyer's credits to business contracts exceeding $2 million; and (4) suspected 2013 amendments to the internal procedures for the Export Buyer's Credit Program. *Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1355-56. China, however, withheld the information requested, deeming it "not applicable" because neither Heze nor its

---

[8]       Under Commerce's regulations, "[i]n the case of a loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually obtain on the market." 19 C.F.R. § 351.505(a)(1).

customers had received buyer's credits during the period of review. *Id.*, 43 CIT at __, 359 F. Supp. 3d at 1349.

As observed by the court in *Clearon I*, with respect to the information withheld by China, "[a]t no point . . . did Commerce say why it needed this information or connect its request with respondents, respondents' products, or their customers." *Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1349.

Notwithstanding the absence of a clear connection between the requested operational information that China withheld, and Heze, its products, or its customers, the Department found, as adverse facts available, that the company used and benefitted from the Export Buyer's Credit Program. It determined, under the two-step analysis required by the statute that: (1) the use of "facts otherwise available" was required because China withheld necessary information requested by Commerce, 19 U.S.C. § 1677e(a); and (2) the use of an adverse inference was warranted because, by withholding information that was in its possession, China failed to act "to the best of its ability" to comply with Commerce's requests for information. 19 U.S.C. § 1677e(b).

Further, based on its adverse facts available determination, Commerce found unreliable the declarations by Heze and its customers indicating that they neither used nor benefitted from the Export Buyer's Credit Program, because, for the Department, without the information that China withheld, it was "unable to analyze fully how the Export Buyer's Credits flow to/from foreign buyers and the China Ex-Im," and, thus, it could not verify the accuracy of Heze's claims of non-use. *See* Final IDM at 6, 13.

### III.    The Court's Findings and Remand Order in *Clearon I*

In *Clearon I*, the court found that Commerce's use of adverse facts available could not be sustained because the Department had failed to explain, and support with record evidence, its finding that "necessary" information was missing from the record—a statutory requirement that must be satisfied before Commerce may consider applying an adverse inference to the missing information. *See* 19 U.S.C.§ 1677e(a)-(b). That is, the Department failed to explain why the information it sought from China, which it failed to provide, about the operation of the Export Buyer's Credit Program was necessary to its determination that the "manufacture, production, or export" of Heze's merchandise had been subsidized. *See* 19 U.S.C. § 1671(a); *Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1363. The court thus remanded the matter, directing Commerce to:

(1)    explain how the information it sought as to (a) whether the China Export Import Bank uses third-party banks to disburse/settle export buyer's credits; (b) the interest rates the bank used during the period of review; (c) whether the bank limits the provision of export buyer's credits to business contracts exceeding $2 million; and (d) suspected amendments to the internal procedures for the Export Buyer's Credit Program, is necessary to make a determination of whether the "manufacture, production, or export" of Heze's merchandise has been subsidized, pursuant to 19 U.S.C. § 1671(a). In doing so, Commerce was directed that it "shall tie its inquiries to Heze, its products, and/or its customers";

(2)    either provide an adequate answer relating to why the information it seeks "to fully understand the operation of the program" fills a gap as to Heze's products and their sale, or rely on the information it has on the record;

(3)    comply with the statute by tying its facts available and adverse facts available determinations to Heze, its products, or its customers; and

(4)      support with substantial evidence its necessary conclusion that there were gaps in

the record evidence that could only be filled with China's responses to its questionnaires. *See id.*

The court also held that if, on remand, Commerce continued to use adverse facts available,

and the court sustained that use, it could apply the 0.87 percent rate that it selected as the adverse

facts available rate for the Export Buyer's Credit Program to calculate Heze's final net subsidy

rate. *Clearon I*, 43 CIT at __, 359 F. Supp. 3d at 1361.


## IV.     The Remand Results Now Before the Court

In the Remand Results, Commerce continued to find that without the information that

China withheld about the operation of the Export Buyer's Credit Program, the use of facts available

was required because "necessary" information was missing from the record, under 19 U.S.C.

§ 1677e(a). It further found that the application of an adverse inference was justified because China

failed to cooperate with Commerce's information requests to "the best of its ability." 19 U.S.C.

§ 1677e(b); Remand Results at 40.

Using adverse facts available, the Department thus determined that Heze used and

benefitted from the Export Buyer's Credit Program, and it continued to use 0.87 percent as the

adverse facts available rate for the program. *See* Remand Results at 40. For Commerce, the

information that China withheld was "necessary" because without a complete understanding of

how the program operates Commerce could not, without undue burden, verify the declarations by

Heze and its customers that they did not use or benefit from the program during the period of

review. *See* Remand Results at 24. In its decisional memorandum, Commerce addressed each of

the court's instructions in turn.

1.      **Commerce's Response to Instruction 1**

        **(a) Third-Party Banks**

Commerce responded to the court's instruction to explain why it is necessary to know whether the China Export Import Bank uses third-party banks to disburse/settle export buyer's credits:

> [K]nowing the bank that disbursed the loan, which may have changed with the [2013] amendments, is necessary information because Commerce needs to know which bank names to look for in the books and records during verification of [Heze]'s customers. Without having knowledge of the banks that disburse funds or how those funds are disbursed to [Heze]'s customers, Commerce is unable to decipher which loans could be attributed to receiving export buyer's credits. Thus, a thorough verification of [Heze]'s customers' non-use of this program without understanding the identity of these correspondent banks would be unreasonably onerous, if not impossible. Without knowing the identities of these banks, Commerce's second step of its typical non-use verification procedure (*i.e.*, examining the company's subledgers for references to the party making the financial contribution) could not by itself demonstrate that the U.S. customers did not use the program (*e.g.*, no correspondent banks in the subledger). Nor could this second step of Commerce's typical non-use verification procedure be used to narrow down the company's lending to a subset of loans likely to be the export buyer's credit (*i.e.*, loans from the corresponding banks). Furthermore, the third step of Commerce's typical non-use verification procedures (*i.e.*, selecting *specific* entries from the subledger and requesting to see underlying documentation such as applications and loan agreements) likewise would be of no value without knowing which banks disburse the loans. This step might serve merely to confirm whether banks were correctly identified in the subledger – not necessarily whether those banks were correspondent banks participating in the Export Buyer's Credit Program. This is especially true given [China]'s failure to provide other requested information, such as the 2013 revisions, a sample application, and other documents making up the "paper trail" of a direct or indirect export credit from the China Ex-Im Bank.

Remand Results at 27-28.

        **(b) Interest Rates**

Next, Commerce addressed why it needed to know about interest rates during the period of review:

> [K]nowing the interest rates for [Heze]'s customers during the [period of review] is not only necessary for verifying whether a loan was received under this program by matching the reported interest rate for this program with interest rates in the books and records of [Heze]'s customers during verification, but is also necessary for calculating a benefit.

Remand Results at 28.

### (c) Minimum Contract Size

Commerce then addressed why it needs to know whether the Export Buyer's Credit

Program is limited to specified business contracts:

> [K]nowing the size of the business contracts for which export buyer's credits flow from foreign buyers and the China Ex-Im Bank, or other Chinese banks, is necessary to narrow the scope of the verification and identify which export buyer's credit loans are being examined during verification proceedings. A thorough understanding of the extent of the export buyer's credits afforded to [Heze]'s customers would have allowed Commerce to further determine whether a loan was provided under the Export Buyer's Credit Program. Thus, verifying non-use of the programs without knowledge of the correspondent banks and the limits on the size of business contracts that would be subject to export buyer's credits would require Commerce to view the underlying documentation for all entries from the subledger *to attempt* to confirm the origin of each loan (*i.e.*, whether the loan was provided from the China Ex-Im Bank via an intermediary bank). This would be an unreasonably onerous undertaking for any company. Therefore, answers to all these questions make up the framework which is used at verification, so Commerce knows which documents to request for review and then what information to use for confirming non-use in the books and records (*i.e.*, which bank names, interest rate amounts, *etc.*). Without this information, Commerce lacks the requisite roadmap for verification. Specifically, answers to these questions were necessary before Commerce could verify [Heze]'s U.S. customers' claims of non-use in this review.

Remand Results at 28-29. Thus, Commerce found:

> [I]t could not *accurately and effectively* verify usage at [Heze]'s customers, even were it to attempt the unreasonably onerous examination of each of the customers' loans. To conduct verification at the customers without the information requested from [China] would amount to looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found.

Remand Results at 21.

### (d) Suspected 2013 Amendments to the Export Buyer's Credit Program

Finally, with respect to why Commerce needs to know what amendments were made to the

Export Buyer's Credit Program in 2013, Commerce stated:

> [China] has refused to provide the requested information or any information concerning the 2013 program revision, which is necessary for Commerce to analyze how the program functions. We requested all documents related to revisions to the program, including the 2013 revisions, because our prior knowledge of this program (as established in the Citric Acid Verification Report on the record of this segment of the proceeding) demonstrates that the 2013 revisions affected [sic] important program changes. For example, in the Citric Acid Verification Report we stated that "EXIM officials indicated the Administrative Measures was revised in 2013 and eliminated the {USD 2 million} contract minimum." We, therefore, sought the 2013 revisions in this proceeding to review this change in program requirements and any other revisions. Specifically, the 2013 revisions (which [China] refers to as "internal guidelines") appear to be significant and have impacted a major condition in the provision of loans under the program.

> This information is necessary and critical to our understanding of the program and for any determination of whether the "manufacture, production, or export" of [Heze]'s merchandise has been subsidized. For instance, if the program continues to be limited to USD 2 million contracts between a mandatory respondent and its customer, this is an important limitation to the universe of potential loans under the program and can assist us in targeting our verification of non-use. However, if the program is no longer limited to USD 2 million contracts, this increases the difficulty of verifying loans without any such parameters, as discussed further below. Therefore, by refusing to provide the requested information, and instead providing unverifiable assurances that other rules regarding the program remained in effect, [China] impeded Commerce's understanding of how this program operates and how it can be verified. Further, to the extent [China] had concerns regarding the non-public nature of the 2013 revisions, Commerce has well-established rules governing the handling of business proprietary information in its proceedings.

Remand Results at 13-14.

### 2.   Commerce's Response to Instructions 2 and 4

Commerce addressed the court's second and fourth instructions together:

> [T]he Court ordered Commerce to provide an adequate answer, supported by the record, as to why it needed the requested information to fill a gap as to [Heze]'s products and their sale. These issues have the same underlying rationale as the first issue in that Commerce does not know what to look for in [Heze]'s books and records if it does not know the bank names or interest rates. This program has gaps

on the record because [China] refused to provide requested information about the
Export Buyer's Credit Program's bank disbursement, interest rates, or possible
limitations regarding business contracts.

Remand Results at 29.

### 3.      Commerce's Response to Instruction 3

As to instruction three, directing Commerce to tie the application of adverse facts available

to Heze, Commerce stated:

> [B]y refusing to provide information regarding the operation, disbursement, and
> allocation of funds of the Export Buyer's Credit Program after it implemented [the
> 2013] changes, [China] withheld information requested by Commerce pursuant to
> [19 U.S.C. § 1677e(a)(2)(A)]. As a result, [China] significantly impeded the review
> pursuant to section [19 U.S.C. § 1677e(a)(2)(C)]. Accordingly, Commerce
> continued to determine that application of facts available to [Heze] regarding this
> program is warranted pursuant to [19 U.S.C. § 1677e(a)(1) and (2)(A), (C)] because
> we are unable to rely on the information provided by [Heze] due to our lack of an
> understanding of the Export Buyer's Credit Program. Further, by failing to provide
> the necessary information after repeated requests, [China] failed to cooperate to the
> best of its ability to comply with Commerce's request for information because it
> refused to provide information regarding the operation, disbursement, and
> allocation of funds of the Export Buyer's Credit Program after it implemented
> changes. Accordingly, the application of an adverse inference to facts available to
> [Heze] is warranted pursuant to [19 U.S.C. § 1677e(b)(2)]. As noted . . . ,
> Commerce may allow an adverse inference against a government to impact an
> otherwise cooperative respondent, when the government is the holder of the
> missing necessary information, as is the case here.

Remand Results at 29-30.

Consolidated Plaintiff and Defendant-Intervenor Heze filed comments on the Remand

Results. *See* Heze's Cmts., ECF No. 49 ("Heze's Br."). Plaintiffs Clearon Corp. and Occidental

Chemical Corp., U.S. domestic producers of the subject chemicals and the petitioners in this

proceeding (collectively, "Clearon" or "Plaintiffs") and Defendant the United States

("Defendant"), on behalf of Commerce, have filed responses to Heze's comments. *See* Clearon's

Resp. to Cmts., ECF No. 53 ("Clearon's Br."); Def.'s Resp. to Cmts., ECF No. 50 ("Def.'s Br.").

Heze disputes Commerce's use of adverse facts available in the Remand Results. For Heze,

it was unreasonable for Commerce to use adverse facts available to make a finding that conflicts

with uncontroverted record evidence showing that neither the company nor its customers used or

benefitted from the Export Buyer's Credit Program during the period of review. Moreover, it

maintains that Commerce could have verified the declarations of non-use placed on the record,

even without the information that China withheld. *See generally* Heze's Br.

For their part, Clearon and Defendant urge the court to sustain the Remand Results. *See*

Clearon's Br. 2; Def.'s Br. 7.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

Where the Department lacks the information it needs to make a countervailing duty

determination, it must use "facts otherwise available." 19 U.S.C. § 1677e(a). If Commerce

determines that the use of facts otherwise available is warranted, and makes the additional finding

that a party "has failed to cooperate by not acting to the best of its ability to comply with a request

for information," it may use an adverse inference "in selecting from among the facts otherwise

available." 19 U.S.C. § 1677e(b)(1); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373,

1381 (Fed. Cir. 2003) (discussing the two-step analysis that applies to the use of facts available

and adverse inferences under 19 U.S.C. § 1677e).

A foreign government may be found to be a non-cooperating party. *See Fine Furniture*, 748 F.3d at 1371 ("[O]n its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including a foreign government, fails to provide requested information."). Under such circumstances, the application of adverse facts available "may adversely impact a cooperating party, although Commerce should seek to avoid such impact if relevant information exists elsewhere on the record." *Archer Daniels Midland Co. v. United States*, 37 CIT __, __, 917 F. Supp. 2d 1331, 1342 (2013) (citation omitted). When making an adverse inference, Commerce may rely upon information derived from the petition, a final determination in the investigation, any previous review or determination, or any other information placed on the record. *See* 19 U.S.C. § 1677e(b)(2)(A)-(D).

# DISCUSSION

Central to Commerce's argument in support of its use of adverse facts available in the Remand Results is that without the information that it requested from China,[9] it would be unreasonably onerous, if not impossible, to verify Heze's claims that neither it nor its U.S. customers used or benefitted from the program. *See* Remand Results at 21; 19 U.S.C. § 1677(5)(B). That is, for Commerce, the missing information was "necessary" to carry out verification of the claims according to its usual non-use verification method. Commerce described this method in the Remand Results:

> If Commerce were attempting to confirm whether a respondent exporter had received any loans from a state-owned bank, for example, its first step would be to

---

[9]       As noted, this information included (1) whether the China Export Import Bank uses third-party banks to disburse/settle export buyer's credits; (2) the interest rates the bank used during the period of review; (3) whether the bank limits the provision of export buyer's credits to business contracts exceeding $2 million; and (4) suspected 2013 amendments to the internal procedures for the Export Buyer's Credit Program.

examine the company's balance sheets to derive the exact amount of lending outstanding during the period of examination. Second, once that figure was confirmed, Commerce would then begin examining subledgers or bank statements providing the details of all individual loans. Because Commerce could tie the subledgers or bank statements to the total amount of outstanding lending derived from the balance sheets, it could be assured that the subledgers were complete and that it therefore had the entire universe of loan information available for further scrutiny. After examining the subledgers for references to the state-owned banks (for example, "Account 201-02: Short-term lending, Industrial and Commercial Bank of China"), Commerce's third step would be to select specific entries from the subledger and request to see underlying documentation, such as applications and loan agreements, in order to confirm the accuracy of the subledger details. Thus, confirmation that a complete picture of relevant information is in front of the verification team, by tying relevant books and records to audited financial statements or tax returns, is critical.

Remand Results 7-8.

Heze urges the court to reject Commerce's claim that it cannot rely on the information in Heze's questionnaire responses because it cannot verify that information. The company maintains that its responses are fully verifiable using Commerce's usual verification methods:

> [T]he Department can verify [Heze's] customer's non-receipt of funding through the China Ex-Im Bank by using its normal verification methodologies to tie the customer's reported receipt of loans and financing to the customer's books and records. The Department can also verify [Heze]'s non-use of Export Buyer's Credit funding by reviewing [Heze]'s books and records for reported payment of goods sold to its U.S. customers and reported financing and loans.

Heze's Br. 13. Heze also points out that it fully cooperated with Commerce's requests for information, and that the record evidence shows that neither Heze nor its U.S. customers used the Export Buyer's Credit Program during the period of review. *See* Heze's Br. 10.

Further, Heze contends that Commerce has failed to comply with the court's remand order because is it has failed to demonstrate that the operational information about the program that Commerce desires (*i.e.*, the role of third-party banks, interest rates, minimum contract values, and 2013 amendments to the program) is necessary to make a determination of whether the "manufacture, production, or export" of Heze's merchandise has been subsidized, pursuant to 19

U.S.C. § 1671(a). *See* Heze's Br. 1-2. Indeed, for Heze, Commerce has failed to tie its inquiries to

Heze, its products, and/or its customers, or answered the question why the missing information

"would fill a gap as to [Heze's] products and sales." Heze's Br. 2; *see* 19 U.S.C. § 1677e(a).

Commerce's use of adverse facts available to fill in purported gaps in the factual record of

proceedings in which China has failed to provide requested information about the operation of the

Export Buyer's Credit Program has been the subject of several opinions by this Court. On similar

factual records, the Court has rejected Commerce's position that information about the *operation*

of the Export Buyer's Credit Program is necessary for it to verify a respondent's claimed non-*use*

of the program. *See, e.g.*, the line of cases captioned *Guizhou Tyre Co. v. United States*[10]; the line

---

[10]         *See Guizhou Tyre Co. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270
(2018) (remanding to Commerce, noting that although "information as to the functioning of the
Program was missing, this finding was rendered immaterial by responses from both Guizhou and
[China] as to the Program's use. This defect proves fatal to Commerce's imposition of [adverse
facts available]."); *Guizhou Tyre Co. v. United States*, 43 CIT __, __, 399 F. Supp. 3d 1346, 1353
(2019) (remanding, noting that "Commerce has failed to demonstrate why the 2013 [Export
Buyer's Credit Program] rule change [allegedly impacting the functioning of the program] is
relevant to verifying claims of non-use, and how that constitutes a 'gap' in the record."); *Guizhou
Tyre Co. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1402, 1405 (2019) (sustaining
Commerce's conclusion that "Plaintiffs did not use the [Export Buyer's Credit Program] based on
the record evidence"); *see also Guizhou Tyre Co. v. United States*, 43 CIT __, __, 389 F. Supp. 3d
1315, 1329 (2019) (remanding, noting that "the Department's decision to apply [adverse facts
available] as to the Export Buyer's Credit Program based on an alleged lack of cooperation was
unlawful because Commerce demonstrated no gap in the record, the respondents submitted
evidence of non-use of the Program, and the Department's findings of unverifiability of necessary
information [were] unsupported by record evidence."); *Guizhou Tyre Co. v. United States*, 43 CIT
__, __, 415 F. Supp. 3d 1335, 1343 (2019) (remanding, noting that "[t]here is evidence in the
record that squarely detracts from Commerce's inference that Plaintiffs used and benefited from
the [Export Buyer's Credit Program]. Commerce may not simply declare that the evidence cannot
be verified and therefore, a gap exists. That is not how it works. Commerce must attempt
verification *in order to conclude* that a gap exists related to that inquiry."); *Guizhou Tyre Co. v.
United States*, No. 18-00100, 2020 WL 3033244, at *2 (CIT June 5, 2020) (sustaining Commerce's
conclusion "that the factual record in this case indicates that there was no use of the [Export
Buyer's Credit Program] by Guizhou.").

of cases captioned *Changzhou Trina Solar Energy Co. v. United States*[11]; and the line of cases

captioned *Jiangsu Zhongji Lamination Materials Co. v. United States*.[12]

      The court finds *Guizhou Tyre Co. v. United States*, 43 CIT __, 415 F. Supp. 3d 1335 (2019)

particularly instructive. There, the Court reviewed an explanation by Commerce, as to why it could

not verify the respondent's claims of non-use of the Export Buyer's Credit Program, that is similar

to that found in the Remand Results. As summarized by the Court:

> Commerce continues to find that there is a gap in the record because the Department
> cannot verify the submitted non-use declarations without additional information

---

[11]    *See Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1326 (2018) (remanding where "Commerce provided reasoning as to why [China]'s failure to respond adequately made it impossible for it to understand fully the operation of the [Export Buyer's Credit Program] [i.e., which would pertain to the "financial contribution" element of the statute], but it failed to show why a full understanding of the [Export Buyer's Credit Program]'s operation was necessary to verify non-use certifications [which would pertain to the "benefit conferred" element]."); *Changzhou Trina Solar Energy Co. v. United States*, No. 17-00198, 2019 WL 5856438, at *4 (CIT Nov. 8, 2019) (remanding, where "[a]lthough Commerce has shown that [China] failed to answer certain questions regarding the [Export Buyer's Credit Program]'s operation, it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program."); *Changzhou Trina Solar Energy Co. v. United States*, No. 17-00198, 2020 WL 4464258, at *4 (CIT Aug. 4, 2020) (sustaining "Commerce's decision to accept the certifications of non-use"); *see also Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2018 WL 6271653, at *3 (CIT Nov. 30, 2018) (remanding where Commerce had "not explain[ed] why it was necessary for it to fully understand the [Export Buyer's Credit Program] in order to ascertain claims of non-use."); *Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2019 WL 6124908, at *3 (CIT Nov. 18, 2019) (remanding to Commerce, noting that although "[China] failed to answer certain questions regarding the [Export Buyer's Credit Program]'s operation, it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program."); *Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2020 WL 4464251, at *3 (CIT Aug. 4, 2020) (sustaining "Commerce's decision to accept [the plaintiffs'] claims of non-use on remand in this instance [as] supported by substantial evidence").

[12]    *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1333 (2019) (remanding because "Commerce again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program."); *Jiangsu Zhongji Lamination Materials Co. v. United States*, No. 18-00089, 2020 WL 1456531, at *3 (CIT Mar. 24, 2020) (sustaining Commerce's uncontested remand results, in which Commerce decided to recalculate plaintiff's final net countervailing duty rate excluding the Export Buyer's Credit Program).

> surrounding the 2013 revisions to the [Export Buyer's Credit Program]. One of the
> revisions involved routing [Export Buyer's Credit Program] loans through
> (undisclosed) third-party banks, and not through the Export-Import Bank of China
> . . . as Commerce originally thought. As in the previous administrative review, the
> Department reiterated that "[China] once again refused to provide the sample
> application documents or any regulations or manuals governing the approval
> process [for the Program]." Without this information, Commerce concluded that it
> could "not verify non-use of export buyer's credits" "in a manner consistent with
> its verification methods, which are primarily the methods of an auditor, attempting
> to confirm usage or claimed non-usage by examining books and records which can
> be reconciled to audited financial statements, or other documents." Commerce
> asserts that the "completeness" principle is "an essential element of Commerce's
> verification methodology," . . . and without the allegedly "missing" information,
> the Department's verification "would amount to looking for a needle in a haystack
> with the added uncertainty that Commerce might not even be able to identify the
> needle when it was found." Therefore, Commerce continues to impute usage of the
> [Export Buyer's Credit Program] based on the application of adverse facts
> available.

*Guizhou Tyre*, 43 CIT at __, 415 F. Supp. 3d at 1341 (internal record citations omitted). The Court

rejected Commerce's explanation, noting that "[t]he Department's (flawed) reasoning has

remained unwavering" despite many opinions issued by the Court "urging Commerce to correct

the repeated blatant deficiencies in its adverse facts available analyses of the [Export Buyer's

Credit Program]." *Id.* Specifically, the Court found that Commerce had failed to make a finding

that a "gap" in the record existed with respect to the required statutory elements of a countervailing

duty determination:

> In its redetermination, Commerce again invoked the authority to use an adverse
> inference based on the finding that [China] did not act to the best of its ability in
> responding to the Department's request for "the 2013 administrative rules, as well
> as other information concerning the operation of the [Export Buyer's Credit
> Program]." Here, the Department's investigation relates to whether the [Export
> Buyer's Credit Program] provides a countervailable subsidy to Plaintiffs. Under the
> [countervailable duty] statute, this requires a finding that a specific financial
> contribution occurred, and a benefit was therefore conferred. *See* 19 U.S.C.
> § 1677(5). The gap then, must relate to either element of this inquiry. Just because
> Commerce resorted to adverse facts available "does not obviate the need for
> Commerce to affirmatively find that the elements of the statute have been satisfied."
> [*Changzhou Trina Solar Energy Co. v. United States*, 43 CIT __, __, 359 F. Supp.
> 3d 1329, 1338 (2019)]. But as it currently stands, the Department has assumed the

conclusion—that a gap in the record exists as a result of [China]'s failure to cooperate—without addressing what "constitutes a 'gap' in the record," [*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1347 (Fed. Cir. 2011)], and by pointedly closing its eyes on the evidence provided by Guizhou that would "fairly detract[ ]" from its ultimate conclusion, *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The law does not permit Commerce to circumvent the statutory requirements of the [countervailable duty] statute just because a respondent fails to cooperate; nor is Commerce "relieve[d] [ ] from relying on *some* facts to make the requisite determinations to satisfy the elements of 19 U.S.C. § 1677(5)." *Changzhou Trina Solar Energy Co.*, 43 CIT [at] __, 359 F. Supp. 3d at 1340 (emphasis added). Stripped away of its misconceptions surrounding the [adverse facts available] statute, the Department is left with the most compelling facts placed on the record: that Plaintiffs did not use the Program, and therefore, no specific benefit was conferred.

*Id.*, 43 CIT at __, 415 F. Supp. 3d at 1342-43 (internal record citation omitted). The *Guizhou Tyre*

Court found compelling that

> [t]here is evidence in the record that squarely detracts from Commerce's inference that Plaintiffs used and benefited from the [Export Buyer's Credit Program]. Commerce may not simply declare that the evidence cannot be verified and therefore, a gap exists. That is not how it works. Commerce must attempt verification *in order to conclude* that a gap exists related to that inquiry.

*Id.*, 43 CIT at __, 415 F. Supp. 3d at 1343. Accordingly, the Court remanded with instructions that

Commerce "attempt verification of the submitted non-use declarations from Plaintiffs' U.S.

customers, using all reasonable tools at its disposal, including methods suggested by Plaintiffs and

by this court;" and "detail its process in its remand redetermination as it relates to its verification

of the non-use declarations." *Id.*, 43 CIT at __, 415 F. Supp. 3d at 1344.

After remands in the *Guizhou Tyre* case, as well as the *Changzhou* and *Jiangsu* lines of

cases, Commerce ultimately determined (under protest[13]) that the Chinese respondents in each case

had not used or benefitted from the Export Buyer's Credit Program.

---

[13]     It is worth noting that, despite Commerce's respectful protest, the United States elected not to file an appeal in any of the aforementioned cases.

Here, Commerce's duty was to determine whether the Export Buyer's Credit Program provided a benefit to Heze. Under the statute, that determination required a finding as to whether "a specific financial contribution occurred, and a benefit was therefore conferred." *Guizhou Tyre*, 43 CIT at __, 415 F. Supp. 3d at 1342 (citing 19 U.S.C. § 1677(5)). Evidence pertinent to this inquiry was on the record. Heze's declarations and questionnaire responses show that neither the company nor its customers used or benefitted from the program. Rather than attempt to verify this information, however, Commerce concluded it would be too onerous to do so without the information withheld by China, and therefore it could not be used (creating a gap). In other words, Commerce did not analyze whether the missing information actually created a gap that mattered to Heze's case.

It is worth noting that in its questionnaire response, Heze has maintained that it did not "qualify for funding through the Export Buyer's Credit Program because the China Ex-Im Bank funds large capital projects and contracts for mechanical and electronic products, complete sets of equipment, and high-tech products and services that are valued at more than $2 million." Heze's Br. 3. "Furthermore, [Heze] would have been required to purchase export credit insurance, which it did not." Heze's Br. 6 (record citations omitted). These statements are based on the requirements of the program found in information that China placed on the record in response to Commerce's questionnaires. For Heze, "[t]he Department is able to verify each of these criteria through its on-site verification methodologies that the Department describes in its [Remand Results]," but it unreasonably failed to do so. Heze's Br. 3.

As in *Guizhou Tyre*, Commerce used adverse facts available against a cooperative respondent to fill an alleged gap that it concluded existed without first attempting to verify the information pertinent to its "benefit" inquiry under the statute. Although Commerce, in the

Remand Results, takes the court through why it wanted this information, as has been found in other cases in this Court, it is not clear that any of the missing information was "necessary" to Commerce's central statutory inquiry, *i.e.*, to determine whether the Export Buyer's Credit Program provided a benefit to Heze. Thus, it appears that, as in *Guizhou Tyre*, "the Department has assumed the conclusion—that a gap in the record exists as a result of [China's] failure to cooperate—without addressing what 'constitutes a "gap" in the record,' and by pointedly closing its eyes on the evidence provided by [Heze] that would 'fairly detract[ ]' from its ultimate conclusion." *Guizhou Tyre*, 43 CIT at __, 415 F. Supp. 3d at 1342 (internal citations omitted). "The law does not permit Commerce to circumvent the statutory requirements of the [countervailable duty] statute just because a respondent fails to cooperate; nor is Commerce 'relieve[d] [ ] from relying on *some* facts to make the requisite determinations to satisfy the elements of  19 U.S.C. § 1677(5).'" *Id.* (citation omitted).

The Remand Results set out the steps of Commerce's usual non-use verification method. Remand Results at 7-8. The parties are instructed to confer and jointly devise a procedure, which may include modifications of the usual method, by which the Department can conduct verification of the declarations of non-use. Alternatively, Commerce may find, based on the existing record evidence, that neither Heze nor its customers used or received a benefit under the program.

## CONCLUSION and ORDER

Based on the foregoing, it is hereby

**ORDERED** that the Remand Results are remanded to Commerce; it is further

**ORDERED** that, on remand, Commerce issue a revised redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that, on remand, the parties shall confer and agree upon a verification procedure to apply in this case; it is further

**ORDERED** that Commerce must either (1) verify Heze's claims of non-use and, based on the results of verification, determine whether Heze received a benefit under the program; or in the alternative, (2) find, based on the existing record evidence, that neither Heze nor its customers used or received a benefit under the program; and it is further

**ORDERED** that the revised redetermination shall be due ninety (90) days following the date of this Opinion and Order; any comments to the revised redetermination shall be due thirty (30) days following the filing of the revised redetermination; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

                                                                    /s/ Richard K. Eaton
                                                                    Richard K. Eaton, Judge

Dated: October 8, 2020
       New York, New York